523 So.2d 714 (1988)
In RE: The Petition of Lucia Mary SCALA, As Parent and Natural Guardian of Tara Lyn Maloney, a Minor. and Gregory Stevenson Maloney II, a Minor.
No. 87-0154.
District Court of Appeal of Florida, Fourth District.
April 6, 1988.
Robert L. Bogen of Braverman & Bogen, Fort Lauderdale, for appellant-Gregory Maloney, the natural father.
No appearance for appellee.
PER CURIAM.
AFFIRMED.
DOWNEY, J., concurs.
LETTS, J., concurs specially with opinion.
GLICKSTEIN, J., dissents with opinion.
LETTS, Judge, concurring specially.
This appeal arises from an order to show cause predicated on Florida Rule of Civil Procedure 1.540. In that order, the issuing judge set forth that "it has been called to this court's attention that a fraudulent judgment changing names of children may have been obtained by perjury of the mother." At the ensuing hearing, the trial judge required the presence of a state's attorney and a court reporter, preparatory to possible criminal perjury charges.
The central issue was whether the mother perjured herself in stating in her affidavit, to achieve constructive service of process on a non-resident father [see section 68.07(6), Florida Statutes (1985)], that she had made diligent search and inquiry and that her ex-husband's residence was unknown to her. [Also see section 49.041(3)(a).]
The father, seeking cancellation of the alleged fraudulent judgment, appeared at the show cause hearing. Thereat, the mother testified that the father owed several years in back child support for the two children now 13 and 10 years old totalling some $13,000 and that her letters to him had gone unanswered except for some harassing phone calls made by him. She further testified that when she tried to call him at his last known address (where, at the hearing, he averred he had lived all along) she was told by his brothers that the father had moved, they did not know where he was and he was leaving the state. There was substantial and competent evidence that she tried unsuccessfully to locate him by telephone on numerous occasions. In addition, the mother testified that URESA could not find him and reported his whereabouts as unknown.
To be sure, the father refuted much of this and when the trial judge indicated he was going to rule for the mother, the father protested that the judge was accepting the mother's credibility in preference to his. To this protest, the trial judge responded:
That's what makes for judges. Sometimes you believe some of this and some of that.
The trial judge was the trier of the fact; he accepted the mother's version that she had "done all she could do as a reasonable person under the requirements of the law" and even found that the father had "wilfully concealed his whereabouts and address for a substantial period of time." The hearing was "a swearing match," but that match was won by the mother. That being so, I do not believe this cause should be reversed.
As to the deficiencies in the pleadings, these were not raised in the trial court. Indeed, they are not raised on appeal. (The father is represented by counsel, the mother has not appeared.)
Finally, as to the father's pride in his noble family name, it is regrettable that this pride was not of sufficient consequence to engender court ordered child support. There was no testimony from the father that he did not have the financial capability to make these payments.
*715 GLICKSTEIN, Judge, dissenting.
I respectfully reject the majority's perception of due process as reflected by its affirmance in a case where, in my view, (a) children's and parents' welfare are respectively concerned, (b) one of the parties has not had his day in court, and (c) the trial court erred in conducting a proceeding and deciding as it did.
In the instant case, the mother filed a so-called "verified petition" for a change of name of the parties' children  a daughter born in January 1975 and a son born in September 1976. She alleged that she and her husband were divorced in Connecticut; and that the petition was being filed for a purpose which I think would be legitimate if it were shown the father abandoned the children, saying:
L. That the sole purpose of this Petition is that Petitioner seeks to legalize names of the Minor Petitioners, to create harmony and continuity in both school and private life of the Minor Petitioners who have been abandoned by their natural father.
However, the petition, signed on October 1, 1985, was not verified, as it contained only an acknowledgment of the kind one would find on a deed or mortgage. Petitioner never swore to the truth of the allegations.
Petitioner then signed a so-called "affidavit of diligent search and inquiry" which was not an affidavit at all. It, too, contained only an acknowledgment in the same form as the petition. Again she failed to swear to the truth of what she alleged. The "affidavit" said:
2. That I have made diligent search and inquiry as to the whereabouts of my ex-husband, GREGORY STEVENSON MALONEY's residence and have been unable to find or determine same after such diligent search and inquiry.
3. That Petitioner made inquiry through URESA for payment of back child support and was informed that my ex-husband no longer resided in the State of Connecticut as of August, 1984.
4. That my ex-husband's residence is unknown.
5. That Affiant has made inquiry as to the last known address of my ex-husband and has not been able to locate him.
We have no idea in what county the petitioner signed the "affidavit," but it was the basis for service only by publication  not personally. Provisions for constructive service are to be strictly construed. See Canzoniero v. Canzoniero, 305 So.2d 801 (Fla. 4th DCA 1975), and cases cited therein.
The father learned of the proceeding only when he received the final judgment which changed his children's names. He wrote the trial judge, who scheduled a hearing which was conducted in December 1986. Only the mother was represented in the dispute between the parties concerning a variety of subjects such as child support, unknown residences of both parties and personal conduct. It was not a "swearing match," when we consider how much of what was said in support of the former wife's position was contained only in an unverified pleading or was presented by her lawyer in argument. Such material may not be weighed against documentary evidence or sworn testimony.
The mother's following testimony  as opposed to her lawyer's unsworn argument  is apparently, in large measure, the reason for the trial court's confirming its earlier judgment and the majority's action in this nightmarish version of People's Court. Petitioner was asked by her lawyer if she wished to add anything to the lawyer's unsworn argument:
MS. SCALA: Only that I called him several times, and his brothers lived with him, so I find out now.
I would call collect, using my daughter's name so they would accept charges. I was told he had moved. They didn't know where he was.
I wrote to him, trying to get child support from him. He owes me several years in back support.
Prior to contacting Ms. Weiner to change the children's names, the last time I had seen him, was in November of the previous year, when he came here to *716 Florida. I let him use my house and I let him use my car.
He gave me $400 in four years of child support, then he started harassing me again, to the point where I had to change jobs several times.
He would send pictures of me that he had taken while we were married, where I was half dressed, and he would send them to my house to embarrass me.
When I would go after him for child support, I have been hitting a dead end.
She was asked by the trial court to explain her "affidavit" in light of postmarks from Gregory Maloney, 72 Walter Dr., Woodbridge, N.J. 09095, in February and October, 1985. She replied:
MS. SCALA: One is February of 1985, and the other is October of 1985.
This was the last known address I had. When I called  as a matter of fact, I had several phone numbers to New Jersey, which I later found out were job sites that he worked at. I would call collect there, using my daughter, Tara's, name, and they wouldn't accept the charges.
I have a good five or six phone numbers that I used to call. I did reach his brother on several occasions, but I was always told that he was gone. He was leaving the state.
She then testified that she had been receiving child support from the father but the record is unclear whether it was February, 1984, 1985 or 1986.
The father testified that he wanted the children to have his name and that of his father and grandfather. He was obviously proud of the name. He further testified that he spent thousands of dollars looking and that he could not find where the children were living and that he had with him receipts for $8,000 in child support.
The special concurrence suggests that one who wishes his issue to bear his name ought to be as conscientious about their support. In the instant case we do not know by any means that the former husband has been less than conscientious about child support. It is hard to pay child support if you do not know where to send the money; and the husband said, as already noted, that he had receipts for a great amount of child support money he had sent. He said he never missed a child support payment when he knew where the children were  including recently, once he found out their latest address. The wife can be said halfheartedly to have corroborated the last part of that statement. The husband said the wife had moved frequently to prevent him from seeing the children. It should be borne in mind that the divorce took place in Connecticut, the husband now lives a relatively short distance from there, in New Jersey, but the wife and children live in Florida. Contact between the former marriage partners has been sporadic.
Albeit the ex-wife has been shown to have written letters to the husband at his present address, she apparently served notice of what amounts to a name-changing proceeding, by publication only. Can a search be considered diligent but unavailing unless one attempts service at the person's last known address? Is the difference between attempted service of process and attempted correspondence or telephone calls a difference in kind rather than a difference in degree?
At one point, the trial court announced in the hearing that it was reversing its final judgment; and that the children would be known as Maloney. However, as the hearing progressed, one party would speak up, then another, then the mother's lawyer. The mother then said that the husband had harassed her and the order came down, confirming the final judgment and holding:
UPON CONSIDERATION THEREOF, it is the finding of the Court that the father of the children, ex-husband of Petitioner, has wilfully [sic] concealed his whereabouts and address for a substantial period of time and that the mother, LUCIA MARY SCALA, has done all she could do as a reasonable person and under the requirements of law, and the Court further finds from the testimony that the ex-husband merely uses the court system to hassle and harass the former wife.
While the decision here, made on the basis of what I have described and without *717 the testimony of the children, or other proof, responds to the pleas of the mother  it interrupts, erroneously, I think, the passing down of the paternal surname to appellant's children, while leaving him with financial and moral obligations to them. Clearly, due process requires reversal of the final judgment and remand with direction to enable the father to respond to the allegations and have his day in court. Petitioner did not plead under oath, nor prove the father's abandonment. He was entitled  notwithstanding the mother's bitterness  to have an informed decision on the question of abandonment, about which the judgment is silent. An informed decision means balancing the needs and interests of the children, the mother and the father. This can only be done by remanding the case to the trial court and having an orderly proceeding with both represented by counsel and other witnesses heard, not just the mother's conclusions as to the children's wishes or difficulties. Were this a reversal, appointment of a guardian ad litem for the children, to buffer the bitterness between the parents and to assist in reaching an informed decision, would be appropriate. A first-rate form of appointing guardians ad litem, devised by Circuit Judge Stephen R. Booher, is reproduced in the winter 1988 issue of Family Advocate, published by the Family Law Section of the ABA.
Shakespeare wrote, of the theft of one's good name, as follows:
Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; 'tis something, nothing:
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed.
Othello III, iii, 1. 155. If this is true, how must we characterize deprivation of the opportunity to pass one's surname to one's descendants? Is that not an even greater loss?
In our culture, tradition calls for perpetuation of paternal surnames by handing them down through the male line. Some choose to change their surname, sometimes in the belief that concealing their ethnic origin will help them to get ahead professionally or socially. Such changes, though legal, are far from universally approved; and even they are a far cry from abandonment of minor children's paternal surname at the behest of their divorced mother.
In the well-known musical play, ethnic in origin but universal in appeal, Tevye proclaims in his opening lines that abandonment of tradition makes life as shaky as a fiddler on the roof. We should not lightly affirm an order depriving a father of such immortality as passing on his surname represents, and depriving children of their patronymic heritage, when the grounds therefor are as nebulous as here, and when there is serious doubt of any good faith effort to give the father notice of the proceeding.
Due process and children's bonding, both very human considerations, are involved in this decision. As for the humanity involved in due process, Associate Justice William J. Brennan, Jr., in The Forty-Second Annual Benjamin N. Cardozo Lecture, Reason, Passion, and "The Process of the Law," said of America's Constitutional Framers:
The Framers took issue with the notion of a natural hierarchy in society, which required embodiment in a supreme sovereign. Instead, their vision of individual equality led them to place sovereignty in the people at large: "there is no supreme power but what the people themselves hold." As a result, Americans regarded the relationship between the government and the people in a fundamentally new way. Government officials were considered agents of the people, to whom certain limited authority had been delegated. As one historian puts it, "[t]he entire government had become the limited agency of the sovereign people."
... .
The Framers therefore offered a theory of the basis of government that represented *718 a sharp break with the past and its assumptions of a natural social hierarchy. They saw government as a contract "formed by the individuals of the society with each other, instead of a mutual arrangement between rulers and ruled."
Id. at 16 (Emphasis in original) (Footnotes omitted). He then said:
Under such a theory of government, due process could no longer mean mere official conformity to duly enacted legal rules  governance by reason alone. Instead, due process required fidelity to a more basic and more subtle principle, the essential dignity and worth of each individual. Since those who ruled possessed no inherent superiority over those they ruled, the requirements of due process now applied to all officials, commanding them to treat citizens not as subjects but as fellow human beings.
I understand the result of the present majority's reversal of In the Interest of M.D.A., D.J.A. and M.L.A., 517 So.2d 711 (Fla. 4th DCA 1987), to be the protection of the father's right to due process. In my recent paper, Appealing Important Issues for Children, which I presented to the National Association of Counsel for Children at its annual meeting in January 1988, I cited that case to illustrate the impact of the denial to parents of due process can have on the resolution of children's needs. In that case, bonding was a "silent issue" as it is in so many children's cases. The children had been with either the maternal grandmother, H.R.S., or in foster homes since 1982, because of the parents' poverty and indebtedness.[1] The reversal delayed their permanent placement, whether with the natural father or elsewhere, for yet a longer period. Accordingly, the father has been treated "humanly"; but the effect upon the children, who desperately need bonding, remains to be seen.
In this case, the trial court  and, by acquiescence, the majority  appears to have given short shrift not only to due process rights of this father, but also, perhaps inadvertently, to any opportunity for bonding between the children and father. This case is typical: the judges do not hear from the children, but only from the embattled adults. How much more human it would be to seek a result that brings these children and father closer, as was a real possibility in the case of M.D.A., D.J.A. and M.L.A. as a result of this court's opinion therein.
NOTES
[1] Judicial notice of this court's briefs in that case, brings to light what is not specified in the opinion. See Arnold Lumber Co. v. Harris, 503 So.2d 925 (Fla. 1st DCA 1987).